Filed 8/14/20  In re C.V. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.V. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E074625 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ1400309) |
| v. | OPINION |
| R.V. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County. Michael J. Rushton, Judge. Affirmed.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant R.V.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant E.V.

1

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

On January 27, 2020, the juvenile court denied R.V.'s (father) and E.V.'s (mother) modification petitions and terminated parental rights to their children, C. and R., under Welfare and Institutions Code[1] section 366.26. Both parents appeal contending the Riverside County Department of Public Social Services (DPSS) and the court failed to comply with the inquiry and notice requirements of the Indian Child Welfare Act of 1978. (25 U.S.C. § 1901 et seq.; ICWA). They further argue the court erred by denying their Welfare and Institutions Code section 388 petitions to reinstate reunification services and by finding the beneficial parent-child relationship exception to adoption did not apply. We reject parents' contentions and affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

### A. *The First Dependency Proceedings Involving C.*

#### 1. *Detention.*

In April 2014, DPSS filed a dependency petition under section 300, subdivisions (b) (failure to protect) and (g) (no provision for support) on behalf of C., a newborn child, alleging mother's incarceration and ongoing mental health issues, and father's ongoing mental health, anger, and substance abuse issues, impaired their ability to care for the child. On April 14, 2014, the juvenile court found prima facie evidence to remove C. from her parents' care.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

### 2. *Jurisdiction and disposition report and hearing.*

According to the jurisdiction/disposition report filed May 9, 2014, mother was adopted by the maternal grandfather and his first wife, who passed away when mother was nine years old. The maternal stepgrandmother (MSG) informed the social worker that mother "got bad into drugs" in 2008 (using methamphetamine, cocaine, PCP, and uppers), refused to remain in each rehabilitation center she was enrolled in, became physically abusive, and was diagnosed with schizophrenia and bipolar disorder. Mother's incarceration was for a domestic violence incident involving a knife and the paternal grandfather.

At the May 14, 2014 jurisdiction/disposition hearing, the court sustained the allegations in the first amended petition, declared C. a dependent, removed her from parents' custody, and ordered reunification services and visitation. Both parents filed Judicial Council form ICWA-020 (parental notification of Indian status) indicating they had no Indian ancestry as far as they knew.

### 3. *Six-month status review report and addendum.*

In the six-month status review report filed October 31, 2014, the social worker reported father was unemployed but living with his parents. He was compliant with his case plan and consistent with visitation. According to the addendum report filed December 16, 2014, mother was compliant with her case plan while incarcerated and after her release on October 31, 2014. Although she was eager "to get to know and care" for her daughter, she refused to acknowledge "any history of substance use, misuse or

abuse." On December 19, 2014, the court continued parents' reunification services and ordered mother to submit to a psychological evaluation if recommended by her therapist.

### 4. *Twelve-month status review report and hearing.*

In the 12-month status review report filed May 28, 2015, the social worker stated that both parents remained compliant with their case plans, they continued to make efforts to improve their lives free from drugs and alcohol, and there were no safety concerns. On June 10, 2015, based on DPSS's recommendation, the juvenile court placed C. with her parents on a family maintenance plan and on the condition the paternal grandparents provide support.

### 5. *Section 387 petition.*

Less than four months later, DPSS initiated supplemental proceedings (§ 387) to remove C. from mother's care based on her continued "abuse [of] controlled substances and [her] noncomplian[ce with] her Court ordered case plan." According to the section 387 detention report filed September 24, 2015, as of August 3, 2015, she was using methamphetamine and living on the streets. On September 22, 2015, C. was removed from mother's care but remained in father's custody.

In the jurisdiction/disposition report filed October 27, 2015, the social worker stated mother was located at the maternal grandparents' home, however, she was "deteriorating behaviorally and cognitively." A psychological evaluation revealed she was "'suffering from a severe neuro-cognitive disorder due to her extensive methamphetamine abuse.'" Mother was described as being grossly impaired and unable to take care of herself. On November 2, 2015, the court sustained the allegations in the

4

second amended section 387 petition and terminated mother's reunification services. On December 10, 2015, family maintenance services were continued as to father.

On May 6, 2016, father filed an ex parte request to terminate dependency proceedings. The request was granted; father was given primary legal and physical custody of C., and supervised visitation was authorized for mother.

B. *The Second Dependency Proceedings Involving C. and R.*

1. *Detention.*

On September 21, 2018, DPSS received a referral alleging general neglect. Mother, who was nine months pregnant, claimed father had punched her in the face. Two prior referrals were received in 2017 concerning mother and father engaging in domestic violence. A police officer informed the social worker that the "family is well known to law enforcement and they have each been arrested multiple times for being the aggressor in a domestic violence assault." In October 2018, mother gave birth to a baby boy, R. Mother told the social worker she and father had gotten back together a few months after the prior dependency had closed. Mother disclosed she began using methamphetamine at the age of 19 but became sober in 2016, when she was 28 years old. She stated she was diagnosed with anxiety and depression but had not taken any psychotropic medications in 11 months. Mother admitted to slapping father in the face but denied that he had assaulted her. The social worker interviewed C., who stated she had witnessed physical fights between her parents. When confronted with C.'s statements, mother called C. a "compulsive liar." The social worker also spoke with father; however, he "presented with disjointed thoughts, delusional thinking, and some dichotomous reasoning."

5

On November 2, 2018, DPSS filed a dependency petition under section 300, subdivision (b)(1) (failure to protect) on behalf of C. and R., alleging both parents have criminal histories and expose the children to ongoing acts of domestic violence, and father has unresolved mental health and anger issues. Each parent filed parental notification of Indian status forms indicating no Indian ancestry; however, upon hearing that mother was adopted, the juvenile court asked the maternal grandfather if he had any information "related to the mother having Indian ancestry." He replied, "No." On November 5, 2018, the children were removed from their parents' custody.

2.      *Jurisdiction and disposition report and hearing.*

According to the jurisdiction/disposition report filed November 26, 2018, the children were placed with the maternal grandparents. The social worker opined that "[d]espite the parents participating in Court ordered services, they failed to benefit from the services." She identified the "substantial history of domestic disputes" as the primary problem necessitating intervention. Other concerns included their "undiagnosed and/or untreated mental health issues," the "ongoing history of drug use, not limited to marijuana and cocaine," and mother's "previous diagnosis of schizoaffective disorder due to her history of drug use." Mother informed the social worker that she was adopted by a "social worker at McClaren Hall in El Monte" when she was two or three years old.

On November 29, 2018, the court sustained most of the allegations in the first amended supplemental petition, declared the children dependents of the court, ordered reunification services for both parents, and ordered father to participate in a medication assessment and psychological evaluation.

6

### 3. Subsequent reports concerning domestic violence and visitation.

In the social worker's report filed March 11, 2019, it was noted that father's anger management issues appeared to be escalating. On January 23, 2019, mother went to the police station asking to obtain a temporary restraining order against father, but she left without following through. On February 14, 2019, two calls were made to law enforcement regarding domestic violence. The next day, father reportedly "punched his pregnant wife in the stomach, slapped her, and threw her to the ground several times." Mother was hospitalized. The court issued an emergency protective order, but mother returned home soon after the incident and recanted the allegations. Father was diagnosed with "Bipolar and Related Disorder, Hypomanic Episode W/O Prior Major Depressive Episode, Delusional Disorder Grandiose Type, and Narcissistic Personality Disorder." His therapist opined that father might require a higher level of care or medication management.

On April 18, 2019, DPSS filed an addendum report to address liberalizing mother's visitation. The social worker recommended "no change in visitation orders." While mother had completed a parenting class and an outpatient substance abuse program, and had been consistently testing negative for controlled substances, the social worker expressed concerns about the continued domestic violence. In addition to the previously reported domestic violence calls to law enforcement, calls were made on March 7, March 20, and April 5, 2019. Father admitted he smoked marijuana on a daily basis and prior to his visits with the children. The social worker "advised that he should not be under the influence while visiting or caring for the children." When mother visited

7

the children, she spent "much of the visit with [R.]" because "the baby requires more attention" and C. "did not play" with mother.

4. *Six-month status review report*, *addendum*, *and contested hearing.*

According to the six-month status review report filed May 10, 2019, DPSS recommended terminating reunification services as to both parents and setting a section 366.26 hearing with a permanency goal of adoption. The social worker noted both parents' prior denial of any Native American ancestry but related that mother, on May 7, 2019, stated a DNA ancestry test showed she was 58 percent Native American. Mother had no information as to her ancestral tribe because her "'bio mother is deceased and bio father unknown.'" While both parents had made progress on their case plans, they did not appear to be "benefitting from their participation in Domestic Violence services." Dr. Robert Suiter conducted a psychological assessment of father and opined there were no "'reassurance[s] at all that [father] would benefit from services.'" Both parents regularly visited the children. On May 30, 2019, the court set a contested six-month status review hearing.

In its addendum report filed June 18, 2019, DPSS continued to recommend terminating services and setting a section 366.26 hearing. The social worker reported another domestic violence incident in May 2019, when father yanked the ignition out of their car, leaving mother stranded in the middle of the street outside DPSS's office. Father was angry and stated the social worker had a "personal vendetta against him and [was] racist against Mexicans." Based on father's demeanor and erratic behavior, DPSS determined it would not be safe for the children to visit with him that day. Father

8

continued to test positive for marijuana. Mother was diagnosed with "P-Intermittent Explosive Disorder, Unspecified Depressive Disorder, and Schizophrenia." She had not reached her goal of "increasing insight and identifying effective coping and parenting skills" as she exhibited "aggressive behavior, verbal and physical, three times per week." Her therapist expressed many concerns, including mother's minimization of her domestic violence and blaming others for her behavior, and recommended continuing therapy. According to mother's psychological evaluation, her prognosis was favorable only to the degree she could remain separated from father and take her prescribed medications.

On June 27, 2019, the court noted there was reason to believe the children may be of Indian ancestry and that ICWA may apply. Nonetheless, the court terminated reunification services and set a section 366.26 hearing with a permanent plan of adoption. Both parents filed notices of intent to file a writ petition; however, the petitions were dismissed.

     5.    *ICWA notices.*

On August 13, 2019, DPSS served and filed ICWA notices for each child. Notice was provided to the Bureau of Indian Affairs (BIA) and the U.S. Department of the Interior. The notices identified mother's married and maiden names (not her birth name), her date and place of birth, and the biological maternal grandmother's name. Regarding additional information, the notices provided: "Mother was interviewed on 5/15/19 by Social Services Practioner [*sic*], Stacy Vasquez, and a CSD 4597 was emailed to ICWA noticing on 5/15/2019. Mother indicated per her DNA test she discovered she was 58% Native American. Tribe is unknown at this time. Mother was adopted around 2 to

9

3 years old and was unable to provide any identifying information on her biological parents other than a first and last name of her biological mother. A search of C-IV and Accurint was conducted on 7/22/2019 and a print out of all known family members and associates was forwarded to the Social Services Practioner [*sic*] on 7/23/2019. On 6/27/2019, step maternal grandmother, [MSG], was interviewed by Noticing Office Assistant, Christy Alcocer. She provided family information for the adoptive family." The U.S. Department of the Interior was unable to determine tribal affiliation because the notice contained insufficient information.

6.     *Sections 366.26 and 366.3 status review report and addendum.*

According to the sections 366.26 and 366.3 status review report filed October 11, 2019, parents' visitation with the children became "sporadic" because mother was again pregnant, and she asked to suspend visitation until after the baby was born, and father had canceled several visits. In September 2019, mother gave birth to a baby girl, Re.[2]

---

[2]  On October 16, 2019, DPSS filed a dependency petition under section 300, subdivisions (b)(1) (failure to protect) and (j) (abuse of a sibling) on behalf of Re. based on both parents' substantiated allegations of general neglect of their older children, who had been exposed to acts of domestic violence. According to the detention report, both parents denied "having tribal linkage pertaining to Native American and/or Alaskan heritage." Each parent filed separate parental notification of Indian status forms indicating the same. Mother refuted her prior report of a domestic violence incident from February 2019, claiming that she "'passed out and must have imagined something happened that did not happen,'" or attributed it to her being "'pregnant and having hormonal issues.'" Father also denied the incident, asserting mother was making it up. Father stated that he and mother "know not to 'tattle-tell' on each other now." Law enforcement had not received any calls from the home since May 2019. On October 17, 2019, the juvenile court detained Re. On November 7, 2019, the court found that the child came within section 300, subdivisions (b)(1) and (j), adjudged her a dependent of the court, and allowed her to remain in both parents' care, with family maintenance services.

In its addendum report filed December 24, 2019, DPSS continued to recommend termination of parental rights as to C. and R. and adoption by the maternal grandparents with whom the children had been residing since November 5, 2018.  According to the maternal grandparents, the children saw "them as their parents" and "look to them when they want to be 'cuddled,' play, or have their needs met."  The maternal grandparents fully understood that adoption was a lifelong commitment, wanted to always be there for the children, and believed they could provide the children with stability, love, and attention.  C. wanted the maternal grandparents' home to be her "'forever home.'"

7.    *Section 388 petitions.*

Father filed a section 388 petition as to each child on December 31, 2019, and mother filed the same on January 2, 2020.  Both parents sought to reinstate family reunification services.  As for changed circumstances, father asserted he "is currently on Family Maintenance as to the minor [Re.] and is progressing well in his services," "has been attending individual therapy, a substance abuse program through MFI Recovery Center and has been testing clean," "is completing a parenting program through Safe Care, and he is also enrolled in a Domestic Violence program and group therapy through Cox Romain."  As for mother's changed circumstances, she asserted she "is on Family Maintenance as to her youngest daughter [Re.] and is doing well in her services," and "is currently enrolled in domestic violence classes, has been attending individual therapy, and parenting at home care."  Both parents claimed to have benefited from the services received; father added that he has cooperated with DPSS and has participated in "appropriate and positive" visits, while mother stated that she "loves her children very

11

much and believes that it is in their best interest for the Court to order Family Reunification Services" so they can "reunify with their youngest sister who is on FM with the parents." A hearing on the section 388 petitions was set.

On January 17, 2020, the maternal grandparents requested de facto parent status.

DPSS opposed the section 388 petitions on the grounds (1) "the parents' circumstances may be changing, [but] they have not changed," and (2) "re-establishing reunification services to them would be detrimental and not in the best interest of these children." Although both parents visited the children, R. did not "remember" them and seemed "traumatized and crie[d] often during the visits," and C. appeared "to play on her own a lot." The social worker opined the children did not "appear to see [mother and father] as their parents. They do not look forward to the visits and [C.] often seems indifferent, except when it comes to comforting her brother." Even though they were participating in therapy and domestic violence programs, their circumstances had not changed.

### 8. *Sections 388 and 366.26 hearing.*

A contested section 366.26 hearing in combination with a hearing on the section 388 petitions was held on January 27, 2020. The court also heard the maternal grandparents' request for de facto parent status. Father provided stipulated testimony that (1) he had benefited from services, (2) he had completed a substance abuse program, (3) he was not using marijuana, (4) he had attended five Narcotics Anonymous (NA) meetings (but had forgotten to bring his signed cards to the hearing), (5) he had participated in eight sessions of a domestic violence program, four to five sessions of

12

individual counseling, and some marriage counseling, and (6) Re. was safe in his care. Mother also provided stipulated testimony that (1) she had attended four to five individual counseling sessions, eight domestic violence classes, and some marital counseling courses, (2) she had benefitted from the courses, (3) there was no additional domestic violence in her relationship with father, and (4) her home was suitable for the children. In response, the children's counsel acknowledged both parents' participation in various programs; however, counsel argued there was no change in their circumstances, and it was not in the best interest of the children to provide further reunification services to mother and father. DPSS concurred.

The court denied the section 388 petitions. The court noted the history of the case was replete with domestic violence, dating back to 2014, and that both parents had poor mental health. The court opined that "as to the historical issues related to this couple, the severity of those issues, how they relate to both of your mental health issues, and a chronic history of substance abuse, a few months of either sobriety or not hurting each other and not calling the police on each other does not mean that the underlying issues in this case are resolved." The court expressed concern that both parents were "basically white-knuckling it." Thus, the court stated, "the entire history of this particular case is so extreme that the efforts made by the parents most recently are de minimis and result, at most, in what the Court would view as changing circumstances." Regarding the best interests of the children, the court observed the children to be "very bonded to their current caretakers. [R.] really knows no other parents. [C.] has very negative memories of her parents and a very positive outlook on her current environment."

13

The juvenile court granted the maternal grandparents' request for de facto parent status, found the beneficial exception to adoption did not apply, terminated parental rights, and ordered adoption as the permanent placement plan. The court also found ICWA did not apply. Both parents filed timely notices of appeal.

## II. DISCUSSION

### A. ICWA.

Both father and mother contend the juvenile court and DPSS failed to satisfy their inquiry and notice obligations under ICWA, and they ask that we remand the matter with directions for DPSS to "properly notify the tribe and BIA after fulfilling its duty to inquire regarding the children's ancestry."

#### 1. ICWA requirements and standard of review.

"ICWA established minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes. [Citations.] In 2006, California adopted various procedural and substantive provisions of ICWA. [Citation.] In 2016, new federal regulations were adopted concerning ICWA compliance. [Citation.] Following the enactment of the federal regulations, California made conforming amendments to its statutes, including portions of the Welfare and Institutions Code related to ICWA notice and inquiry requirements. [Citations.] Those changes became effective January 1, 2019 . . . , and govern here." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048 (*D.S.*).) The new statute defines the actions necessary to determine a child's possible status as an Indian child.

14

ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); accord, Welf. & Inst. Code, § 224.1, subd. (a) [adopting the federal standard].) "*Being an 'Indian child' is thus not necessarily determined by the child's race, ancestry, or 'blood quantum,' but depends rather 'on the child's political affiliation with a federally recognized Indian Tribe.'*" (*In re Austin J.* (2020) 47 Cal.App.5th 870, 882 (*Austin J.*), italics added.)

"ICWA itself does not impose a duty on courts or child welfare agencies to inquire as to whether a child in a dependency proceeding is an Indian child. [Citation.] Federal regulations implementing ICWA, however, require that state courts 'ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child.' [Citation.] The court must also 'instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.'" (*Austin J.*, *supra*, 47 Cal.App.5th at pp. 882-883.)

Since states may provide "a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under" ICWA (25 U.S.C. § 1921), under California law, the court and the county welfare department have an "affirmative and continuing duty to inquire" whether a child in dependency

proceedings "is or may be an Indian child." (Welf. & Inst. Code, § 224.2,[3] subd. (a) ["The duty to inquire [whether a child is or may be an Indian child] begins with the initial contact."]; Cal. Rules of Court, rule 5.481(a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 14.)

Initially, the county welfare department must ask the "child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (Welf. & Inst. Code, § 224.2, subd. (b).) At the parties' first appearance before the juvenile court, the court must ask "each participant present in the hearing whether the participant knows or has *reason to know* that the child is an Indian child" (§ 224.2, subd. (c), italics added), and "[o]rder the parent . . . to complete Parental Notification of Indian Status ([Cal. Judicial Council] form ICWA-020)." (Cal. Rules of Court, rule 5.481(a)(2)(C), italics omitted.)

When there exists a *reason to believe* that an Indian child is involved, the social worker must "make further inquiry regarding the possible Indian status of the child." (Welf. & Inst. Code, § 224.2, subd. (e).) "The Legislature, which added the '*reason to believe*' threshold for making a further inquiry in 2018, did not define the phrase. When that threshold is reached, the requisite 'further inquiry' 'includes: (1) interviewing the

---

[3] Former section 224.3 (Stats. 2006, ch. 838, § 32) was renumbered as section 224.2, effective January 1, 2019 (Stats. 2018, ch. 833, § 5).

parents and extended family members;[4] (2) contacting the Bureau of Indian Affairs and State Department of Social Services; and (3) contacting tribes the child may be affiliated with, and anyone else, that might have information regarding the child's membership or eligibility in a tribe.'" (*Austin J.*, *supra*, 47 Cal.App.5th at p. 883, italics added; see Welf. & Inst. Code, § 224.2, subd. (e)(1)-(3); Cal. Rules of Court, rule 5.481(a)(4)(A)-(C).)

"In addition to the inquiry that is required in every dependency case from the outset and the 'further inquiry' required under California law when there is a '*reason to believe*' an Indian child is involved, a third step—notice to Indian tribes—is required under ICWA and California law if and when 'the court knows or has *reason to know* that an Indian child is involved . . . .' [Citations.]

"The duty to provide notice is narrower than the duty of inquiry. Although the duty of inquiry applies to every 'child for whom a petition under Section 300, 601, or 602 may be or has been filed' [citation], and the duty of further inquiry applies when there is a '*reason to believe* that an Indian child is involved in a proceeding' [citation], the duty to provide notice to Indian tribes applies only when one knows or has a '*reason to know . . .* an Indian child is involved,' and only 'for hearings that may culminate in an order for foster care placement, termination of parental rights, preadoptive placement, or adoptive placement.'" (*Austin J.*, *supra*, 47 Cal.App.5th at pp. 883-884, italics added.)

---

**4** The term "extended family member" is defined as "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); accord, Welf. & Inst. Code, § 224.1, subd. (c).)

Effective January 1, 2019, the Legislature redefined the "*reason to know*" requirement that triggers the duty to give notice of the proceedings to Indian tribes. (*In re A.M.* (2020) 47 Cal.App.5th 303, 316 (*A.M.*), italics added; see Welf. & Inst. Code, § 224.3; Stats. 2018, ch. 833, §§ 4-7.) Before January 1, 2019, a "*reason to know*" could be based on "*information suggesting the child is a member of a tribe or eligible for membership in a tribe* or one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe." (Welf. & Inst. Code, former § 224.3, subd. (b)(1), italics added; Stats. 2006, ch. 838, § 32.) As of January 1, 2019, the *mere suggestion of eligibility for membership* as to the child—*or the mere suggestion of membership as to the parents*, *grandparents*, *or great-grandparents—no longer provides a reason to know that the court is dealing with an Indian child*. (Welf. & Inst. Code, § 224.2, subd. (d).) Now, the amended statute declares that there is *reason to know* an Indian child is involved if, for instance, "[a] person having an interest in the child . . . informs the court that the child is an Indian child." (§ 224.2, subd. (d)(1).)[5] The changes

---

[5] Section 224.2, subdivision (d), describes six circumstances providing a *reason to know* an Indian child is involved: "(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child. [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village. [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child. [¶] (4) The child who is the subject of the proceeding gives the court reason to know he or she is an Indian child. [¶] (5) The court is informed that the child is or has been a ward of a tribal court. [¶] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe."

18

to the statute conform the definition of "*reason to know*" to the definition in federal regulations promulgated in 2016. (25 C.F.R. § 23.107(c); see *A.M.*, *supra*, 47 Cal.App.5th at p. 316.)

"In defining the 'reason to know' standard as a reason to know that a child '*is* an Indian child,' the BIA expressly denied requests for more inclusive language, such as, '"is *or could be* an Indian child"' or '"*may be* an Indian child."' [Citation.] In rejecting the broader phrases, the BIA pointed to concerns that such language would cause 'undue delay, especially when a parent has only a vague notion of a distant [t]ribal ancestor.' [Citations.] Indeed, tribal ancestry is not among the criteria for having a reason to know the child is an Indian child." (*Austin J.*, *supra*, 47 Cal.App.5th at p. 885.)

"On appeal, we review the juvenile court's ICWA findings for substantial evidence. [Citations.] But where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*D.S.*, *supra*, 46 Cal.App.5th at p. 1051.)

### 2. ICWA Compliance.

Both parents criticize DPSS for failing to conduct an adequate inquiry into mother's Indian ancestry. However, neither parent addresses the revised criteria for evaluating whether DPSS had a *reason to believe* that Indian children were involved.[6] (§ 224.2, subd. (e).) Nonetheless, the court ultimately found that ICWA does not apply.

---

[6] They maintain that "the duty of inquiry was triggered by the juvenile court's finding" of a "*reason to believe*" an Indian child was involved. However, there is insufficient evidence to support this finding. (See *Austin J.*, *supra*, 47 Cal.App.5th at pp. 888-889.)

This finding implies that a duty of inquiry under California law had been satisfied. Sufficient evidence supports the court's implied finding.

According to the initial dependency petition filed in April 2014, both parents denied Indian ancestry. Also, they separately filed parental notification of Indian status declarations stating the same. When a second dependency case was initiated in 2018, both parents again denied any Indian ancestry when interviewed and at the first court appearance in response to the court's inquiry. Upon discovering that the mother was adopted, the court asked the maternal grandfather whether he had any knowledge of mother's Indian ancestry. He replied that he did not. Both parents again filed separate parental notification of Indian status forms indicating they had no Indian ancestry. For the first time on May 7, 2019, mother claimed Native American ancestry based on a DNA ancestry test. On May 30 and June 27, the social worker interviewed MSG in an attempt to obtain further information about mother's possible Indian ancestry. Subsequently, when dependency jurisdiction was initiated as to the third child, Re., both parents reiterated their denial of any Indian ancestry.

Based on mother's statements to DPSS and the court, along with her parental notification of Indian status declarations indicating she and her children have no Indian ancestry and are neither members nor eligible for membership in an Indian tribe, there is no "reason to believe" that any of her children are Indian children based on her parentage. (§ 224.2, subd. (e).) Likewise, mother's claim of Native American ancestry based on a

DNA ancestry test is insufficient to support a "reason to believe" the children are Indian children as defined in ICWA.  At most, it suggests a mere possibility of Indian ancestry.  But, as stated in *Austin J.*, "Indian ancestry, heritage, or blood quantum, however, is not the test; being an Indian child requires that the child be either a member of a tribe or a biological child of a member.  [Citations.]  Being a member of a tribe depends 'on the child's political affiliation with a federally recognized Indian Tribe,' not the child's ancestry.  [Citations.]  Consequently, 'many racially Indian children' do not fall within ICWA's definition of an Indian child, while others may be Indian children even though they are 'without Indian blood.'  [Citation.]  Indian ancestry, without more, does not provide a reason to believe that a child is a member of a tribe or is the biological child of a member." (*Austin J.*, *supra*, 47 Cal.App.5th at pp. 888-889; see *In re Jeremiah G.* (2009) 172 Cal.App.4th 1514, 1520 ["if the child is not a tribe member, and the mother and the biological father are not tribe members, the child simply is not an Indian child"]; *Brackeen v. Bernhardt* (5th Cir. 2019) 937 F.3d 406, 428 ["ICWA's definition of Indian child is a political classification"], rehg. en banc granted (5th Cir. 2019) 942 F.3d 287, 289.)  Here, there is nothing more.

Because there was insufficient evidence to provide a reason to believe that the children (or their mother) are members of, or eligible for membership in, an Indian tribe,

21

the statute imposed no duty to make further inquiry.  We reject both parents' claims to the contrary, as well as their reproach of DPSS's actions.[7]

### B.    *Denial of Section 388 Petitions.*

Both parents argue the juvenile court abused its discretion by denying their section 388 petitions.  We disagree.

Section 388 is a general provision permitting the juvenile court, "upon grounds of change of circumstance or new evidence, . . . to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."  (§ 388, subd. (a).)  The statute allows the modification of a prior order only when the petitioner establishes

---

[7] Regarding mother and father's charge that DPSS and the juvenile court were not diligent in their duty of inquiry, this court recently observed, "ICWA does not obligate the court or DPSS 'to cast about' for investigative leads.  [Citation.]  There is no need for further inquiry if no one has offered information that would give the court or DPSS reason to believe that a child might be an Indian child.  This includes circumstances where parents 'fail[] to provide any information requiring followup' [citations], or if the persons who might have additional information are deceased [citation] . . . ."  (*A.M.*, *supra*, 47 Cal.App.5th at p. 323.)  Although the duty to conduct a further inquiry was not triggered in this case, DPSS obtained the biological maternal grandmother's name and included it in the notices provided to BIA and the U.S. Department of Interior.

Regarding both parents' criticism of the social worker's documentation of conversations and failure to obtain mother's adoption file, we find their reliance on *In re N.G.* (2018) 27 Cal.App.5th 474, 484 (*N.G.*), and other pre-2019 cases, to be misplaced.  In *N.G.*, the social worker was informed about the dependent child's possible Indian ancestry when the father stated there were "'paternal cousins'" who were "registered members of 'the Cherokee tribe.'"  (*Id*. at p. 478.)  This information was found to "plainly suggest[] [the child] may be eligible for membership in a federally recognized Cherokee tribe, . . . requir[ing] the social worker to 'make further inquiry.'"  (*Id*. at p. 482.)  "The information that relatives of the dependent child were *members* of a tribe, and not merely tribal ancestors, distinguishes *N.G.* from the instant case . . . .  Moreover, the court in *N.G.* based its holding on the prior definition of a reason to know, which included 'information to suggest [the child is] . . . eligible for membership in a . . . tribe.' [Citations.]  As discussed above, the Legislature has removed that definition from the statutory scheme."  (*Austin J.*, *supra*, 47 Cal.App.5th at p. 890.)

by a preponderance of the evidence that (1) changed circumstances or new evidence exists, and (2) the proposed modification would promote the best interests of the child. (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1193; *In re Y.M.* (2012) 207 Cal.App.4th 892, 919-920.) A parent seeking relief under section 388 "must show changed, not changing, circumstances. [Citation.] The change of circumstances or new evidence 'must be of such significant nature that it requires a setting aside or modification of the challenged prior order.'" (*In re Mickel O*. (2011) 197 Cal.App.4th 586, 615.)

Moreover, "'[i]t is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child.'" (*In re S.J*. (2008) 167 Cal.App.4th 953, 960.) A parent requesting an order for reunification services after they have been terminated has the burden of proving that the benefit to the child of reinstating services outweighs the benefit the child would derive from the stability of a permanent placement. (*In re Angel B*. (2002) 97 Cal.App.4th 454, 464.) We review the ruling on a section 388 petition for an abuse of discretion. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318.)

Here, both parents testified that their circumstances had changed since the court's termination of reunification services in June 2019. Both claimed to have benefitted from the programs they had completed, or were in the process of completing, pointing out that DPSS and the court had allowed their newborn (Re.) to remain in their care, albeit under family maintenance services. Both parents argued there was "no evidence of any current substance abuse whatsoever, [and] no evidence of any ongoing domestic violence." They claimed that "they [were] learning from their services by not having any more domestic

23

violence and by appropriately parenting their young child, [Re.]" And they argued that because they are the parents of C. and R. and have a new baby, they "want[] to be a family all together."

We commend both parents for participating in substance abuse, parenting, and domestic violence programs after reunification services regarding C. and R. were terminated; however, at most, they have shown that their circumstances were changing but had not changed. We note that their participation in these programs was mandated under the family maintenance plan implemented upon the birth of their third child, Re. Although father claimed to have attended five NA meetings, he had failed to provide signed cards to support his claim. Regarding his participation in the domestic violence perpetrator's program, father's progress report mentioned that he "needs improvement in the following areas: open to changing previous behaviors, appearing to be motivated to improve himself, and ability to apply learned techniques and skills in his daily life." Mother's prognosis was favorable but only to the degree she could remain separated from father and would take her prescribed psychotropic medications. In a recent interview with a social worker, both parents "den[ied] documented domestic violence and the father made a statement that he and the mother know not to 'tattle-tell' on each other now." As the juvenile court remarked, this case has "a history of domestic violence involving this couple which goes back to a petition first filed on April 11, 2014." Because of the severity of both parents' mental health and substance abuse issues, we agree with the court's opinion that "a few months of either sobriety or not hurting each other and not

24

calling the police on each other does not mean that the underlying issues in this case are resolved."

Furthermore, neither parent has been able to demonstrate that a changed order was in the best interests of the children. While father claimed that he had benefitted from therapy and that the visits with his children had been "appropriate and positive," he has failed to show *how* it would be in the children's best interests to reinstate his reunification services. Mother asserts that it was in the children's best interest to reunify with their younger sister, who was currently on family maintenance. However, if this allegation were enough to satisfy the best interest prong, no parent seeking modification of a court order under section 388 would need to show the proposed modification actually benefited the dependent children. Moreover, "[a]fter the termination of reunification services, the parents' interest in the care, custody and companionship of the child [is] no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability.'" (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) The court here recognized this shift of focus in determining the ultimate question—what is in the best interests of the children?

In view of the circumstances, it is difficult to see how reinstating services, with the ultimate goal of returning the children to their parents' custody, would be in their best interests. C. and R. were bonded to their maternal grandparents, who had been granted de facto parent status and wanted to solidify their relationship with the children through adoption. Given both parents' short-term sobriety and continuing need to address their domestic violence and substance abuse issues, they failed to show the benefit of

25

reinstating reunification services outweighed the benefit the children would derive from the stability and security of a permanent home. Under these circumstances, the juvenile court did not abuse its discretion in denying the section 388 petitions.

C.      *Termination of Parental Rights.*

Both parents argue the juvenile court erred by terminating parental rights because the parental bond exception applied. We disagree.

When the court finds that "it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption" unless at least one of several statutory exceptions applies. (§ 366.26, subd. (c)(1); see, e.g., *In re Celine R.* (2003) 31 Cal.4th 45, 53.) As relevant here, the parental bond exception provides that a court can forego terminating parental rights if it "finds a compelling reason for determining that termination would be detrimental to the child" because (1) "[t]he parents have maintained regular visitation and contact with the child," and (2) "the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) This exception "to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.'" (*Celine R.*, at p. 53.) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*).)

We review the juvenile court's findings on the existence of the beneficial parental relationship for substantial evidence. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).) Whether "the relationship is a 'compelling reason' for finding detriment to

26

the child" is a "'quintessentially' discretionary decision" that we review for abuse of discretion. (*Id*. at p. 1315; see *In re J.S.* (2017) 10 Cal.App.5th 1071, 1080 [applying hybrid standard of review to sibling bond exception].)[8]

The parent bears the burden of showing that the parental bond exception applies. (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.) "A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption. [Citation.] No matter how loving and frequent the contact, and notwithstanding the existence of an "'emotional bond'" with the child, "'the parents must show that they occupy 'a parental role' in the child's life."'" (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646.) In determining whether the exception applies, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

---

[8] "Appellate courts are divided over the appropriate standard of review for an order concerning the applicability" of the parental bond exception. (*In re Caden C.* (2019) 34 Cal.App.5th 87, 106, review granted July 24, 2019, S255839.) Some have reviewed the decision for abuse of discretion, others have reviewed it for substantial evidence, and still others have combined the two and taken a hybrid approach, as we do. (*Ibid*.) Our Supreme Court granted review of the issue and will therefore resolve "what standard governs appellate review of the [parental bond] exception to adoption." (*In re Caden C.* (July 24, 2019, S255839) ___ Cal.5th ___ [2019 Cal. Lexis 5373].)

Here, the juvenile court found that while both parents had "maintained regular visitation with the children," the "nature of that relationship is well documented in the most recent report in terms of the quality and nature of the visits." After analyzing this case through the authority of *Autumn H.*, the court determined the exception did not apply.

Assuming both parents engaged in regular visitation, they have not demonstrated that their relationship with the children outweighed the benefits of adoption. There is simply no evidence that severing the relationship between both parents and the children would be detrimental to the children. C. and R. were removed from their parents' custody on November 5, 2018, when C. was four years old and R. was one month old. During the next 15 months, both parents regularly visited the children (except during the period surrounding the birth of Re.), as permitted, prompting them to contend there was evidence of a significant parent-child relationship despite the lack of daily contact and the children's positive bond with the maternal grandparents. According to father, he "interacted on multiple levels with [C. and R.], engaged in age-appropriate activities," and brought snacks and toys to his visits. He asserts he "assumed many different roles: nurturer, playmate, and teacher." Similarly, mother points out that she "played with [the children], fed them, redirected them and showed them affection as a parent." However, neither child saw mother and father "as their parents. They [did] not look forward to the visits and [C.] often seem[ed] indifferent, except when it [came] to comforting her brother." In contrast, the maternal grandparents occupied the parental role in the children's lives. By the time of the section 366.26 hearing, the children had been out of

28

their parents' custody for almost 15 months, living with the maternal grandparents, who had been tending to all their daily needs and providing them with a secure and stable home.

Both parents ask us to employ what they consider to be a more liberal application of the exception as provided in *In re Casey D*. (1999) 70 Cal.App.4th 38, 51 and *Jasmine D.*, *supra*, 78 Cal.App.4th 1339, 1350.  However, these cases required the parents to show a parental relationship, not merely a caretaker or friendly visitor relationship with the children.  (*Ibid.*)  Neither father nor mother was able to show their relationship was compelling enough to forego adoption.  Indeed, neither parent presented any evidence showing how severing their relationship would be detrimental to either C. or R., particularly when weighed against the benefit of a permanent home.  While the record arguably indicates both parents had loving contact or pleasant visits with the children, this has repeatedly been found insufficient to support the application of the beneficial parental relationship exception.  (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643; *In re C.F.* (2011) 193 Cal.App.4th 549, 555.)

Simply put, there is no evidence the children would be "greatly harmed" by the termination of their natural parent-child relationship with father and mother.  (*In re Angel B*. (2002) 97 Cal.App.4th 454, 466.)  We, therefore, conclude mother and father have not shown that the juvenile court's findings lack the support of substantial evidence or that its exercise of discretion rested on an unsupported factual basis.  In short, the court properly found the parent-child relationship exception to adoption did not apply.

## III. DISPOSITION

The juvenile court's orders denying the section 388 petitions, terminating parental rights, and placing the children for adoption are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER  
Acting P. J.

We concur:

MILLER  
J.

MENETREZ  
J.

30